UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LINDA LUE GREATHOUSE,          :
    Plaintiff,                          :
                                            :
v.                                              :          No. 3:13cv00526 (DJS)
                                            :
CAROLYN W. COLVIN,                    :
ACTING COMMISSIONER OF          :
SOCIAL SECURITY,                        :
    Defendant.                          :

MEMORANDUM OF DECISION

The plaintiff, Linda Lue Greathouse ("the plaintiff" or "Greathouse"), filed this action

under § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking review of a

final decision by the Commissioner of Social Security ("the defendant" or "the Commissioner")

denying the plaintiff's application under Title II of the Social Security Act for Social Security

Disability benefits ("SSD"). Pending before the Court are the plaintiff's motion for judgment on

the pleadings and the defendant's motion to affirm the Commissioner's decision. For the reasons

stated below, the plaintiff's motion for judgment on the pleadings (doc. # 14 ) is denied and the

defendant's motion to affirm the Commissioner's decision (doc. # 20) is granted.

I. PROCEDURAL HISTORY

The plaintiff Greathouse filed an application for SSD in January 2010 alleging disability

since June 1, 2009. Her claim was initially denied in July 2010 and upon reconsideration in

January 2011. Greathouse subsequently requested a hearing, which was held before an

Administrative Law Judge ("ALJ") on March 6, 2012. The plaintiff, represented by counsel,

appeared and testified at the hearing. In a decision dated April 13, 2012, the ALJ found that

"[t]he claimant has been under a disability as defined in the Social Security Act since June 1,

2009, the alleged onset date of disability." (Doc. # 8-3, at 30, ¶ 11).

On June 8, 2012, the Social Security Appeals Council issued a notice to Greathouse indicating that it was planning to find that she was not disabled, because the Council had reviewed the case and determined that the ALJ's decision was not supported by substantial evidence. After providing Greathouse with an opportunity to submit additional information in support of her claim, the Appeals Council issued a final decision on February 14, 2013, in which it found that Greathouse was not disabled as defined in the Social Security Act and, as a result, not entitled to SSD. The Appeals Council's decision is considered the final decision of the Commissioner.

## II.  STANDARD OF REVIEW

In reviewing the Commissioner's decision, this Court must "determine if the correct legal standards have been applied and if the decision is supported by substantial evidence." *Bushey v. Colvin*, 552 F. App'x 97 (2d Cir. 2014). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Prince v. Astrue*, 514 F. App'x 18, 20 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The Court must carefully review the entire administrative record to determine the reasonableness of the Commissioner's factual findings. *See Plouffe v. Astrue*, No. 3:10 CV 1548 (CSH), 2011 WL 6010250, at *14 (D. Conn.  Aug. 4, 2011). The Commissioner's findings are conclusive if supported by substantial evidence, regardless of whether the reviewing court might have found otherwise. *Id.*

"'It is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.'" *Phelps v. Colvin*, 13-cv-

6022 EAW, 2014 U.S. Dist. LEXIS 68529, at *24 (W.D.N.Y. May 19, 2014) (quoting *Aponte v. Secretary, Department of Health and Human Services*, 728 F.2d 588, 591 (2d Cir. 1984)).  While credibility determinations are within the exclusive province of the Commissioner, a finding that a witness is not credible must be "set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988). Additionally, with regard to any finding that is potentially dispositive on the issue of disability, the administrative decision must include a discussion that is sufficient "to enable a reviewing court to determine whether substantial evidence exists to support that finding." *Schupp v. Barnhart*, Civ. No. 3:02CV103 (WWE), 2004 U.S. Dist. LEXIS 14071, at *6 (D. Conn. March 12, 2004).

A reviewing court "must afford the Commissioner's determination considerable deference . . . ." *Harris v. Commissioner of Social Security*, 09-CV-1112 (NAM/VEB), 2011 U.S. Dist. LEXIS 92366, at *5  (N.D.N.Y. July 27, 2011). In a case where the ALJ and the Appeals Council disagree as to eligibility for disability benefits, "the courts owe deference to the findings of the Appeals Council." *Gross v. Heckler*, 785 F.2d 1163, 1165 (4th Cir. 1986); *see also Jenkins v. Astrue*, Civil No. 3:10cv705-JRS, 2012 U.S. Dist. LEXIS 123275, at *34 (E.D. Va. April 25, 2012) ("deference must be given to the A[ppeals] C[ouncil], rather than the ALJ, where the finding of the AC are supported by substantial evidence").

### III. FACTUAL BACKGROUND

Greathouse was born in 1948 and was  sixty years old on the disability onset date alleged in her application for SSD. She has a high school education and her past relevant work was as a data entry clerk, a job that is classified as semiskilled and sedentary in nature.

Medical History

1. Michael Fischer, M.D.

Dr. Michael Fischer, a board certified internist and member of the UConn Health Partners group, was Greathouse's primary treating physician throughout the time period relevant to this action.[1] In a treatment note for a December 18, 2008 date of service, Dr. Fischer stated that "[t]he patient is a diabetic who comes in regularly for that care and has no complaints." (Doc. # 8-8, at 57). With regard to a January 22, 2009 visit, Dr. Fischer noted that "[t]his is a non-insulin-dependent diabetic, who has not had any followup recently." (*Id.* at 63). In April 2009 Dr. Fischer noted that Greathouse had "no real complaints today [and] still works." (*Id.* at 65). He also noted that her "[l]ower extremities show evidence of mild arthritis in the knee joints." (*Id.*).

On or about May 9, 2009, Greathouse was a passenger in motor vehicle that was involved in an accident. She was transported to the John Dempsey Hospital complaining of right hip pain, neck pain, and left knee pain. She was sent home with a final primary diagnosis of right hip contusion. As a follow-up to the motor vehicle accident, Greathouse was seen by Dr. Thomas Rockland, a member of the UConn Medical Group, on May 13, 2009. With regard to his physical examination of Greathouse, Dr. Rockland noted the following: "General, in no acute distress. Neck moves freely, Reflexes in the upper extremities are normal. Spine is nontender." (*Id.* at 25). His assessment/plan was: "Myalgias after motor vehicle accident. The patient should take Tylenol if she can afford it or Ultracet. She was given a prescription for 40 Ultracet, to take 2

---

[1]Although Dr. Fischer indicated in a Multiple Impairment Questionnaire that he first treated Greathouse in 1990; (doc. # 8-8, at 193); the treatment records from Dr. Fischer submitted in connection with Greathouse's application are limited to the time period between 2008 and 2011.

-4-

tablets 3 times a day." (*Id.*).

Dr. Fischer saw Greathouse again on August 5, 2009. The purposes of her visit were "followup of her diabetes and also for attention to her ongoing back pain and hip pain on the right." (*Id*. at 67). Dr. Fischer noted that "[s]he takes Ultracet . . . for the pain that she has since she suffered a motor vehicle accident on 05/09/2009, in which a car that she was front passenger [i]n was T-boned at an intersection onto the driver's side. This was felt to be a soft tissue injury related to contusion when evaluated by Dr. Rockland back in May. She continues to have pain, although it is apparently lessening." (*Id.*).

In a note concerning a November 4, 2009 visit, Dr. Fischer noted that "[t]he patient is here due to pain on her left side when she lies down only at night to sleep. . . . The patient feels well other than this positional pain on her left side." (*Id.* at 68). At that time Dr. Fischer referred Greathouse "for physical therapy for what appears to be a strain of one of her trunk muscles laterally, may be the latissimus." (*Id.*).

On February 17, 2010, Greathouse saw Dr. Fischer "for reevaluation of the pain that she has in her left flank area. . . . The patient's pain is mostly at nighttime before she goes to sleep when she lies on that left side. She has no other associated symptoms." (Doc. # 8-8, at 114). Dr. Fischer noted that his physical examination of Greathouse was "rather unremarkable" and that "[s]he is not in any distress now [and] cannot do anything to really reproduce the pain." (*Id.*). Notes from visits on April 26, 2010, and August 31, 2010, indicate that Greathouse was being followed-up for diabetes and that she was feeling well. Office visit notes from January 19, 2011, and May 25, 2011, both list diabetes as the "Chief Complaint/Reason for visit" (*Id.* at 119, 123). Both notes also indicate the following as the "Clinical Assessment": "The patient is a 62-year old

female who presents with diabetes." (*Id.* at 120, 124).

A Patient Plan concerning Greathouse indicates that she saw Dr. Fischer on February 1, 2012, because of left hip pain. Dr. Fischer's assessment is noted as "Bursitis" and his plan was to "refer to PT [physical therapy]." (*Id.* at 207).

Dr. Fischer completed a Multiple Impairment Questionnaire ("the Questionnaire") concerning Greathouse that was dated October 14, 2011. In response to the question "What is your diagnosis of your patient's condition?" he listed "diabetes, glaucoma, high cholesterol, high blood pressure, acid reflux, eczema." (*Id.* at 193). He characterized her prognosis as "fair." (*Id.*). He responded "N/A" when asked to identify the positive clinical findings demonstrating or supporting his diagnosis, and listed "elevated lipids" and "elevated blood sugar" when asked to identify the laboratory and diagnostic test results demonstrating or supporting his diagnosis. (*Id.* at 193, 194).

Dr. Fischer listed left hip bursitis as "your patient's primary symptoms, including pain." (*Id.* at 194). In response to the question "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?" he answered "2006." (*Id.* at 199). He further indicated that the nature of Greathouse's pain was "recurrent bursitis pain," the frequency of which was "every night," and he identified "lying down" as the precipitating factor leading to her pain. (*Id.* at 194, 195). Dr. Fischer estimated Greathouse's pain to be in the moderate to moderately- severe range and estimated her fatigue to be in the moderately- severe range.

The Questionnaire completed by Dr. Fischer included a "residual functional capacity" section. In that section, Dr. Fischer indicated the following: Greathouse could sit for only five

hours in an eight-hour day and could stand or walk for less than one hour; she could not sit

continuously in a work setting, but would have to get up every one to two hours to move around;

she could lift and carry up to ten pounds occasionally, but never more than ten pounds. He

further indicated that Greathouse would be significantly limited in using her arms for reaching,

because her shoulders and arms lock up when she raises her arms, and that she needed to avoid

bending and heights.

Dr. Fischer stated that Greathouse's condition interfered with her ability to keep her neck

in a constant position, and that her pain was frequently severe enough to interfere with attention

and concentration. According to Dr. Fischer, Greathouse could tolerate only low stress. He based

this conclusion on Greathouse's own response. He also estimated that Greathouse would likely be

absent from work more than three times a month as a result of her impairments or treatment.

2. Select Physical Therapy

As previously noted, Dr. Fischer initially referred Greathouse for physical therapy on

November 4, 2009. Medical records submitted to the ALJ after the administrative hearing

indicate that Greathouse received physical therapy treatments from Select Physical Therapy

between November 9, 2009, and December 3, 2009. Select Physical Therapy's initial evaluation

of Greathouse indicates that she presented "with left sided hip bursitis with pain upon palpation,

poor flexibility and limited gait." (Doc. # 8-9, at 4). Her chief complaint was listed as "pain," and

"when trying to sleep" was listed as an aggravating factor. (*Id.* at 3). The "date of injury"

indicated on the evaluation was "Month(s) Ago: 2." (*Id.*). Her current work status was listed as

"Full time/Full duty." (*Id.*) That evaluation also indicated that Greathouse's "[o]verall

rehabilitation potential is good" and that she "should respond well to stretching exercises in

-7-

conjunction with manual interventions and pain relieving modalities." (*Id.* at 4).

Notes from seven additional physical therapy sessions between November 12, 2009, and December 3, 2009, consistently indicate that Greathouse tolerated the sessions very well and  was experiencing less pain. Select Physical Therapy's discharge summary, dated December 3, 2009, indicates that Greathouse was being discharged because she had completed her current program. The assessment portion of the discharge summary states as follows: "Based on this patient's clinical presentation, it is my professional opinion that the patient's prognosis at time of discharge is good." (*Id.* at 21).

The post-hearing information sent to the ALJ under cover letter dated April 4, 2012, included additional Select Physical Therapy records covering the period from February 14, 2012, until March 15, 2012. On February 1, 2012, Dr. Fischer had made a second referral for physical therapy.  A plan of care dated February 14, 2012, stated that Greathouse had presented with a two week history of left hip pain and that examination showed "painful but nearly full ROM [range of motion] with moderate weakness and gait deviation." (*Id.* at 25).  That record also states that Greathouse's diagnosis was "consistent with bursitis and suggests possible OA [osteoarthritis] as well." (*Id.*). Aggravating factors for pain were identified as "Walking: 0-10 minutes" and "Lying Down: 20-30 minutes." (*Id.*). The plan estimated that six weeks of physical therapy services would be needed to address Greathouse's condition and assessed her rehabilitation potential as "good." (*Id.*).

Notes from nine subsequent physical therapy sessions between February 17, 2012, and March 15, 2012, consistently indicate that Greathouse tolerated treatment well and experienced decreased pain following her sessions. The latest note, dated March 15, 2012, indicated that

Greathouse "tolerated session very well." (*Id.* at 49). The recommendation at that point was to "[c]ontinue with current program" and "[a]dvance per Rehabilitation Protocol." (*Id.*). There is no further information concerning physical therapy sessions.

3. Samuel Berkowitz, D.P.M.

The record evidence also includes notes from numerous visits Greathouse had with a podiatrist, Dr. Samuel Berkowitz. Dr. Fischer referred Greathouse to Dr. Berkowitz in 2003 due to her "complaint of severe pain of corns of her feet of years in duration." (Doc. # 8-8, at 154). On February 26, 2003, Dr. Berkowitz examined Greathouse and proposed "hammer toe correction" surgery on her right small toe. (*Id.*). The surgery was subsequently performed and four follow-up visits were made between April and June 2003. At the time of her last visit in 2003 Greathouse "note[d] that she is doing great and wearing all shoe gear with comfort." (*Id.* at 159). Dr. Berkowitz noted that "[n]o follow up is required. She is to call upon me at any time should problems arise." (*Id.*).

The next visit to  Dr. Berkowitz documented in the record was on May 25, 2007. That visit was made "in consultation with a history of type II diabetes." (*Id.* at 160). Dr. Berkowitz noted that Greathouse "has no complaints of her feet. . . . My impression is that [Greathouse] has diabetes without risk factors." (*Id.*). Dr. Berkowitz saw Greathouse again on November 26, 2007, at which time he noted that "[m]y impression is that Ms. Greathouse has diabetes without risk factors, deformity, and a symptomatic scar, right. Following prepping and draping, the scar was pared. . . . She may return as needed." (*Id.* at 162).

Greathouse visited Dr. Berkowitz on September 17, 2009, "complain[ing] of pain in her right small toe of months in duration." (*Id.* at 163). Dr. Berkowitz's impression was that

Greathouse had "diabetes with loss of protective sensation and deformities. I did pare away the keratosis[2] of the small toe at the time of the visit. I wrote a prescription for extra-depth orthopedic shoe gear with custom insole. I will recheck her in about six months. She should refrain from self-care, lose weight, and stop smoking." (*Id.* at 163-64).

Greathouse saw Dr. Berkowitz again on May 23, 2011, complaining of "painful callus beneath right small toe of long duration." (*Id.* at 166). After examining the patient, Dr. Berkowitz "wrote a prescription for extra-depth orthopedic shoe gear with custom insoles." (*Id.*). He then indicated that he was "hopeful that this control[s] symptoms. She should return in six months for recheck. She should not be providing self-care to her feet." (*Id.*). Greathouse next saw Dr. Berkowitz on December 12, 2011. The follow-up note from that visit indicates that Greathouse "never filled my prescription for diabetic shoe gear" and was "providing self-care to her symptomatic callus, which I have discouraged." (*Id.* at 206).  During that visit, "the callus was pared." (*Id.*). Dr. Berkowitz again discouraged Greathouse from engaging in self-care, wrote another prescription for orthopedic shoe gear, and indicated he would see her again in twelve months. That is the last note from Dr. Berkowitz in the record.

4. Nathaniel Kaplan, M.D. and Jeanne Kuslis, M.D.

On June 11, 2010, Dr. Nathaniel Kaplan signed a Disability Determination Explanation in which he stated that the medical conditions identified by Greathouse in her application for SSD, i.e., high blood pressure, diabetes, high cholesterol, acid reflux, glaucoma, and eczema, did not "significantly limit your ability to carry out various work activities. In deciding this, we

---

[2]Keratosis is defined as "any skin disease characterized by a horny growth, as a wart." DICTIONARY.COM, http://dictionary.reference.com/browse/keratosis (Last visited Jan. 30, 2015).

considered the medical evidence, your statements, and how your condition(s) affects your ability to work." (Doc. # 8-4, at 7). The medical evidence considered by Dr. Kaplan included records of Greathouse's treatment by Dr. Fischer.

On January 6, 2011, Dr. Jeanne Kuslis signed a Disability Determination Explanation denying Greathouse's reconsideration claim for SSD. The medical evidence considered by Dr. Kuslis included updated records from Dr. Fischer. The reconsideration denial noted that Greathouse was "feeling fine" when she saw Dr. Fischer on August 31, 2010, and that she was not alleging any new or worsening conditions. (*Id.* at 13). Dr. Kuslis concluded that Greathouse's conditions were "not severe enough to be considered disabling" based on a consideration of "the medical records, your statements, and how your condition affects your ability to work." (*Id.* at 15).

<u>Plaintiff's Statements/Testimony</u>

In applying for SSD, Greathouse was asked to "[l]ist all of the physical or mental conditions . . . that limit your ability to work." (Doc. # 8-7, at 6). She identified those conditions as high blood pressure, diabetes, high cholesterol, acid reflux, glaucoma, and eczema. In connection with her application, Greathouse completed a Symptom Questionnaire on February 9, 2010. One of the questions asked on the questionnaire was, "What are your symptoms? (Be sure to describe ALL of your symptoms)." (*Id.* at 35). Greathouse answered that question as follows: "I feel nausea when my blood level is high or low (I am diabetic). I get dizzy when my blood pressure is high." (*Id.*).  Greathouse was also instructed to "[t]ell us anything else you think we need to know about your symptoms." (*Id.* at 37). Her response was, "I have eczema and it ha[s] me itching a lot. The inflammation of my thigh keeps me up at night where I can't lay on my left

-11-

side because of pain." (*Id.*).

On February 9, 2010, Greathouse also provided information concerning her activities of daily living. In response to the question, "What were you able to do before your illnesses, injuries or conditions that you CANNOT do now?" she answered "I can['t] walk very far/hard time climbing stairs, trouble sleeping at night/inflammation of my thigh. I cannot stand up for a long period of time." (*Id.* at 18). She further indicated that she had no problem with personal care, was able to go out alone, and could drive a car. She stated that her husband prepared all of the family's meals, and that her husband and son did all of the household chores and yard work. Greathouse was asked to "[c]heck any of the following items your illnesses, injuries, or conditions affect." (*Id.* at 23). She placed a check mark next to "Standing," "Walking," "Stair Climbing," and "Memory." (*Id.*). She did not place a check mark next to "Sitting," "Reaching," "Lifting," "Bending," or "Using Hands." (*Id.*).

Greathouse completed a second activities of daily living form on August 17, 2010. With regard to what she had been able to do before that she could no longer do, she responded, "I can no longer stand, when I clean I have to take a break and go back to it, it takes longer for me to do my housework." (*Id.* at 50). In response to the question, "Do the illnesses, injuries, or conditions affect your sleep?" she answered, "I can't sleep sometimes at night, I have a digestive problem, where it keeps me up at night, I have glaucoma." (*Id.*). She again indicated that she didn't prepare meals, stating that "I don't prepare meals because it takes a lot of standing and I have problems with my back." (*Id.* at 51). The items Greathouse checked as being affected by her conditions were "Lifting," "Bending," "Standing," "Walking," "Stair Climbing," and "Completing Tasks." (*Id.* at 54). She reiterated that she had no problem with personal care, was able to go out alone,

and could drive a car.

At the administrative hearing held on March 6, 2012, Greathouse testified that her past work generally involved sitting and did not involve lifting or carrying. She also testified that she had retired because of her illness. When asked what her illness prevented her from doing, she responded as follows: "Sitting. I was sick all day, nausea. I had - - I was sick all day. Couldn't stand to sit, or walk that far. . . . I couldn't - - diabet[es] make my stomach sick, nauseous all the time, and I couldn't perform the duties, so that's why I retired." (Doc. # 8-3, at 39). When asked how long she could sit before she had to get up and move around she answered, "I sit, like, 10 minutes, get up, walk around a little bit, come back and sit. Same thing over and over." (*Id*. at 40).

With regard to pain she experiences from bursitis and arthritis, Greathouse testified that "I can be walking. All of a sudden, it's just pain hit. Then it make[s] me almost fall to the floor, and it's like something pulling inside my hip and my thigh." (*Id*. at 41). She indicated that she was currently going to physical therapy and had previously gone to physical therapy "[a] long time ago," and that while physical therapy had helped, "the pains come back." (*Id.*). She also testified that she was unable to go to the store by herself "[b]ecause of my fear I may fall, or something like that." (*Id.* at 42). When asked, "Do you ever have any trouble taking care of yourself, in terms of hygiene?" she answered, "Yes, I do" and identified the problem as "taking a shower." (*Id.* at 43). She stated that she needed to sit in a chair in the bathtub because she was unable to stand up due to hip pain.

IV. DISCUSSION

In order to receive disability benefits under the Social Security Act, an individual must be

-13-

under a "disability," i.e., an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such an impairment must be "of such severity that [the applicant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

The Commissioner applies a five-step analysis in evaluating disability claims. *See* 20 C.F.R. § 404.1520:

> In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do. Although the claimant bears the general burden of proving that he is disabled under the statute, if the claimant shows that his impairment renders him unable to perform his past work, the burden then shifts to the [Commissioner] to show there is other gainful work in the national economy which the claimant could perform.

*Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (internal quotation marks and citations omitted). "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).

Although the ALJ and the Appeals Council agreed as to step one of the analysis, i.e., that Greathouse had not worked since the alleged onset date, "the Appeals Council [did] not agree

-14-

with the Administrative Law Judge's findings under steps two, three, four, or five of the

sequential evaluation process." (Doc. # 8-3, at 6). With regard to step two, the Appeals Council

concluded that "substantial evidence does not support that the claimant's impairments are 'severe

impairments' as that term is used in the regulations. (20 C.F.R. 404.1520(c))." (*Id.*). Greathouse

contends that the Appeals Council erred in concluding that she had failed to demonstrate a severe

impairment. She also claims that the Appeals Council failed to properly weigh the medical

evidence and failed to properly evaluate her credibility.

## A. Severe Impairment

Greathouse contends that in finding her impairments to be non-severe, the Appeals

Council failed to apply the correct legal standard and also failed to properly evaluate the medical

evidence. "At step two of the sequential evaluation process, the [Commissioner] must determine

whether the claimant has a severe impairment that significantly limits his or her physical or

mental ability to do basic work activities." *Taylor v. Astrue*, 11-CV-411 (GTS/VEB), 2012 U.S.

Dist. LEXIS 138328, at *10 (N.D.N.Y. July 20, 2012). Basic work activities include such things

as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . ." 20

C.F.R. § 404.1521(b)(1).

In contending that the Commissioner failed to apply the correct legal standard in

concluding that she did not demonstrate a severe impairment, Greathouse points out that the

second step is intended only to "screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019,

1030 (2d Cir. 1995). While that is an accurate statement of the law in this Circuit, it is also true

that "the mere presence of a disease or impairment, or establishing that a person has been

diagnosed or treated for a disease or impairment is not, by itself, sufficient to render a condition

-15-

severe." *Taylor*, 2012 U.S. Dist. LEXIS 138328, at *11 (internal quotation marks omitted).

Greathouse argues that the medical record demonstrates that her diabetes, bursitis, and arthritis each constituted a severe impairment. "The claimant bears the burden of presenting evidence establishing severity." *Id.* at *10. With regard to diabetes, the Appeals Council found that "the evidence of record shows that it was generally well controlled during the period at issue." (Doc. # 8-3, at 6). The medical evidence before the Appeals Council clearly supports that finding. Dr. Fischer saw Greathouse on a number of occasions during the period in question. His notes refer to her as a "non-insulin dependent diabetic." (Doc. # 8-8, at 63). While there are any number of references to follow-up visits for diabetes, there is nothing in Dr. Fischer's records indicating that Greathouse's diabetes limited her ability to do basic work activities in any way.

Greathouse contends that the record demonstrates she had diabetic complications of her feet beginning in 2009 and continuing through at least 2011. She argues that these records "are consistent with a finding that Ms. Greathouse suffers from severe diabetes with complications . . . ." (Doc. # 15, at 7). As noted above, notes from Greathouse's primary physician, Dr. Fischer, do not in any way indicate that her diabetes limited her ability to do basic work activities. Rather, those notes are consistent with the finding that her diabetes was generally well controlled during this period.

Greathouse visited a podiatrist, Dr. Berkowitz, once in 2009 "complain[ing] of pain in her right small toe[3] of months in duration." (Doc. # 8-8, at 163). On that occasion Dr. Berkowitz treated the right small toe by "par[ing] away the keratosis of the small toe." (*Id.*). He also

---

[3]Dr. Berkowitz had performed hammer toe corrective surgery on Greathouse's right small toe in 2003.

prescribed orthopedic shoe gear and indicated he would re-check her in about six months. Greathouse's next visit to Dr. Berkowitz was on May 23, 2011, which was occasioned by her complaint "of painful callus beneath right small toe of long duration." (*Id.* at 166). With regard to that visit, Dr. Berkowitz noted that her "toenails were cut and the lesions were pared." (*Id.*). He again wrote a prescription for orthopedic shoe gear and stated he was hopeful that would control her symptoms. In a follow-up visit on December 12, 2011, Dr. Berkowitz noted that Greathouse "never filled my prescription for diabetic shoe gear" and was "providing self-care to her symptomatic callus, which I have discouraged." (*Id.* at 206). On that occasion Greathouse's "callus was pared." (*Id.*). Dr. Berkowitz wrote a new prescription for orthopedic shoe gear and indicated he would see her again in twelve months. These facts do not in any way suggest that the Appeals Council erred by finding that Greathouse did not establish that her diabetes constituted a severe impairment. Although Greathouse visited a podiatrist once in 2009 and twice in 2011 due to foot pain, there is nothing to indicate those conditions had any effect on her ability to work.

The Appeals Council noted that there were only two references to arthritis in the medical records. One was a note made by Dr. Fischer in April 2009 stating simply "[l]ower extremities show evidence of mild arthritis in the knee joints." (*Id.* at 65). The other was a note made by a physical therapist indicating that Greathouse's diagnosis was "consistent with bursitis and suggests possible OA [osteoarthritis] as well." (Doc. # 8-9, at 29). This statement appears under the heading "Presentation" in the Assessment portion of an Initial Evaluation form. The "Diagnoses" listed on that form were: "Left Hip/Pelvis," "Enthesopathy[4] of Hip," and "Joint Pain-

---

[4]Enthesopathy is defined as "[a] disease occurring at the site of attachment of muscle tendons and ligaments to bones or joint capsules." DICTIONARY.COM, http://dictionary.reference.com/browse/enthesopathy (Last visited Jan. 30, 2015).

Pelvis." (*Id.* at 28). It is not clear from the record who made the diagnoses reflected on the Initial

Evaluation Form or when they were made. With regard to bursitis, the Appeals Council found

that the record "does not support a finding that the claimant experienced bursitis in her left hip

for more than two brief periods during the period at issue, especially in light of the two-year gap

of any evidence mentioning an impairment of her left hip, from December 3, 2009 through

February 1, 2012." (Doc. # 8-3, at 6).

   In support of her motion for judgment on the pleadings, Greathouse suggests that the

Appeals Council should have found that she started having pain in her hip associated with

bursitis and arthritis following a motor vehicle accident in 2009 that was not relieved with

physical therapy and continued through March 2012. That suggestion does not comport with the

substantial evidence supporting the Appeals Council's findings.

   Immediately after the motor vehicle accident in May 2009 Greathouse complained of

right hip pain, neck pain, and left knee pain. Several days later she saw Dr. Rockland, who noted

her complaints of right-sided neck pain and right lower back pain. In August 2009 Greathouse

visited Dr. Fischer, who noted "her ongoing back pain and hip pain on the right." (Doc. # 8-8, at

67). Apart from the absence of any evidence indicating that injuries sustained in the May 2009

accident limited her ability to do basic work activities, Greathouse's complaints following the

accident related to *right* hip pain, whereas her later complaints and referrals for physical therapy

related to *left* hip pain.

    Greathouse saw Dr. Fischer on November 4, 2009, "due to pain on her left side when she

lies down only at night to sleep. . . . The patient feels well other than this positional pain on her

left side." (Doc. # 8-8, at 68). Dr. Fischer referred Greathouse for physical therapy "for what

-18-

appears to be a strain of one of her trunk muscles laterally, may be the latissimus." (*Id.*). The medical records indicate that Greathouse went for physical therapy on eight occasions between November 9, 2009, and December 3, 2009. The Select Physical Therapy Discharge Summary for Greathouse, dated December 3, 2009, states that she was being discharged at that time because she had completed her current program and that her "prognosis at [the] time of discharge is good." (Doc. # 8-9, at 21).

On February 2, 2012, Greathouse saw Dr. Fischer for left hip pain. His assessment at that time was "Bursitis" and his plan was "refer to PT [physical therapy]." (Doc. # 8-8, at 207). There are records of ten subsequent physical therapy visits to Select Physical Therapy beginning on February 14, 2012, and ending on March 15, 2012. A plan of care dated February 14, 2012, stated that Greathouse had presented with a two week history of left hip pain and that examination showed "painful but nearly full ROM [range of motion] with moderate weakness and gait deviation." (Doc. # 8-9, at 25). Notes from nine subsequent physical therapy sessions indicate that Greathouse consistently tolerated treatment well and experienced decreased pain following her sessions. The latest note, dated March 15, 2012, indicated that Greathouse "tolerated session very well." (*Id.* at 49). The recommendation at that point was to "[c]ontinue with current program" and "[a]dvance per Rehabilitation Protocol." (*Id.*).

The Appeals Council further noted that the record did not contain laboratory findings or diagnoses that support a finding that either Greathouse's arthritis or her bursitis was a severe impairment, and also found that there was no evidence that Greathouse's occurrence of bursitis in 2012 would meet the requirement that a claimant's severe impairment "can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423 (d)(1)(A). The Court

-19-

concludes that the Appeals Council's findings that Greathouse did not establish severity and duration with respect to either her arthritis or bursitis are supported by substantial evidence. The Court will proceed to address the other issues raised by the claimant, i.e., that the Appeals Council failed to properly weigh the medical evidence and failed to properly evaluate her credibility, to the extent those issues could bear on the findings that Greathouse did not establish severity or duration.

### B. The Treating Physician Rule

Greathouse contends that the Appeals Council failed to properly weight the medical evidence. More specifically, she argues that the Appeals Council did not follow the "treating physician rule" in evaluating the medical evidence.   Dr. Fischer was Greathouse's primary treating physician. Dr. Fischer's opinion, expressed in the October 14, 2011 Questionnaire he completed, was that Greathouse would be able to sit for only five hours in an eight-hour day and would be able to stand/walk for less than one hour. He also indicated that Greathouse would be significantly limited in using her arms for reaching, that her pain was frequently severe enough to interfere with attention and concentration, and that she would likely be absent from work more than three times a month as a result of her impairments. In that same Questionnaire, Dr. Fischer listed left hip bursitis as "your patient's primary symptoms, including pain." (Doc. # 8-8, at 194). In response to the question, "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?" he answered "2006." (*Id.* at 199).

The Appeals Council addressed Dr. Fischer's opinion as follows:

Dr. Fischer's functional assessment, dated October 14, 2011 . . .

-20-

is inconsistent with the medical evidence of record. The record contains minimal treatment notes from Dr. Fischer, who is a general practitioner, not an orthopedist. Additionally, Dr. Fischer based his functional limitations primarily on the claimant's left hip bursitis. As noted above, however, substantial evidence does not support a finding that the claimant has continually experienced or is expected to experience limitations from this impairment for any 12-month period during the period at issue. Dr. Fischer also assessed limitations related to the claimant's ability to lift and carry because her "shoulders/arms lock up with arm raising." However, the claimant has not alleged any impairment related to her arms or shoulders and the record does not substantiate any such impairment. Additionally, Dr. Fischer opined that the severity of the claimant's symptoms and limitations applied since 2006. However, the claimant continued to engage in full-time work as a data entry clerk until June 2009. Accordingly, the Appeals Council gives little weight to the opinion of Dr. Fischer.

(Doc. # 8-3, at 7).

The Court finds that the Appeals Council applied the correct legal standard in considering Dr. Fischer's opinion and that the Council's conclusion regarding that opinion is supported by substantial evidence. The "treating physician rule" provides that "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." *Selian v. Astrue*, 708 F.3d 409, 418 (2d. Cir. 2013). "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

In *Mack v. Astrue*, Civil No. 3:09cv2122 (JBA), 2011 WL 1215075 (D. Conn. March 27, 2011), the claimant appealed from a final decision of the Commissioner that did not give

controlling weight to the opinion of a treating physician whose own treatment records did not support that opinion. The claimant argued that in applying the treating physician rule, it is "a treating physician's opinion, and not his or her notes [that] matters." *Id.* at *2.  Because the treating physician's own notes were inconsistent with his ultimate opinion, however, the court concluded that the Commissioner had properly determined that the treating physician's opinion "was not entitled to controlling weight." *Id.*

Here, Dr. Fischer's own treatment notes are inconsistent with his Questionnaire responses that Greathouse's primary symptom, including pain,  was left hip bursitis and that her symptoms date back to 2006. There is no medical evidence from Dr. Fischer in the record for the period prior to December 12, 2008, and there is no mention of left-side pain in Dr. Fischer's records prior to November 4, 2009. On that date, Dr. Fischer noted that Greathouse was experiencing "pain on her left side when she lies down only at night to sleep. . . . The patient feels well other than this positional pain on her left side." (Doc. # 8-8, at 68). On February 17, 2010, Dr. Fischer again noted that Greathouse had pain "in her left flank area . . . mostly at nighttime before she goes to sleep when she lies on that left side." (*Id.* at 114). There is no further mention of left-side pain in Dr. Fischer's notes until February 1, 2012. Dr. Fischer's assessment on that date is noted as "Bursitis" and his plan was to "refer to PT [physical therapy]." (*Id.* at 207). Dr. Fisher's own notes are inconsistent with the opinions he expressed in the Questionnaire indicating that a primary symptom of left hip bursitis pain applied as early as 2006 and resulted in significant functional limitations.

In an instance where a treating physician's opinion is not accorded controlling weight, the Commissioner must determine how much weight it should be given and must provide "good

reasons" for affording little weight to that opinion. *See Burgess v. Astrue*, 537 F.3d 117, 129-30 (2d Cir. 2008). "In order to override the opinion of the treating physician . . . the [Commissioner] must explicitly consider . . . (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418.

The Appeals Council clearly articulated the reasons why it gave little weight to the opinion of Dr. Fischer: (1) the record contains minimal treatment notes from Dr. Fischer, who is a general practitioner, not an orthopedist; (2) Dr. Fischer's opinion as to functional limitations was based primarily on left hip bursitis, but substantial evidence does not support a finding that Greathouse has experienced or is expected to experience limitations from this impairment for any 12-month period; (3) Dr. Fischer also assessed limitations concerning Greathouse's ability to lift and carry because her shoulders and arms lock up with arm- raising, but Greathouse did not allege any impairment relating to her arms or shoulders and the record does not substantiate any such impairment; and (4) Dr. Fischer expressed an opinion that the severity of Greathouse's symptoms and limitations applied since 2006, but she was engaged in full-time work until June 2009. The Appeals Council satisfied the requirements of considering the relevant factors and providing good reasons for giving little weight to the opinion of Dr. Fischer.

The Court also notes that there are internal inconsistencies within the Questionnaire in which Dr. Fischer expressed his opinions. Although Dr. Fischer listed pain from left hip bursitis as Greathouse's primary symptom, including pain, his response to the question "What is your diagnosis of your patient's condition?" listed "diabetes, glaucoma, high cholesterol, high blood

pressure, acid reflux, eczema," but did not mention bursitis. (Doc. # 8-8, at 193). While Dr. Fischer's functional limitations opinion was based primarily on pain from left hip bursitis, he indicated that the frequency of that pain was "every night" and identified "lying down" as the precipitating factor leading to her pain. (*Id.* at 195). "A physician's opinions are given less weight when his opinions are internally inconsistent." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012). The internal inconsistencies within the Questionnaire provide additional support for giving little weight to the opinions of Dr. Fischer.

Greathouse also contends that the Appeals Council accorded undue weight to the opinions of physicians who had not examined her but had offered opinions based on a record review. In this case two physicians determined that the medical conditions identified by Greathouse in her application for SSD, i.e., high blood pressure, diabetes, high cholesterol, acid reflux, glaucoma, and eczema[5], did not significantly limit her ability to perform basic work activities. These determinations were based on a consideration of "the medical records, your statements, and how your condition affects your ability to work." (Doc. # 8-4, at 7, 15). In its decision, the Appeals Council stated that it "agrees with and gives significant weight to" the consultants' findings that "the claimant's diabetes mellitus, essential hypertension, obesity, hyperlipidemia, and glaucoma are non-severe impairments, because these impairments or combination of impairments do not significantly limit the claimant's physical ability to do basic work activities." (Doc. # 8-3, at 8).

The consulting physicians did not address bursitis in their reports. In applying for SSD,

---

[5]In her appeal Greathouse does not contend that she demonstrated a severe impairment with respect to her high blood pressure, high cholesterol, acid reflux, or glaucoma. For that reason, the Court does not address those conditions.

Greathouse was asked to "[l]ist all of the physical or mental conditions . . . that limit your ability to work." (Doc. # 8-7, at 6). She identified those conditions as high blood pressure, diabetes, high cholesterol, acid reflux, glaucoma, and eczema. There was no mention of bursitis in her application and the consulting physicians made their determinations before Dr. Fischer had completed the October 14, 2011 Questionnaire.

In general, the Commissioner "give[s] more weight to opinions from . . . treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence . . . ." 20 C.F.R. § 404.1527 (c)(2).  However, the regulations "permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record." *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995). Dr. Fischer's opinion regarding functional limitations was based primarily on pain from left hip bursitis. To that extent, the opinions of the non-examining physicians, who did not mention bursitis in their reports, were not addressed in the decision of the Appeals Council. To the extent that Dr. Fischer's opinion was based on Greathouse's diabetes, the Court has already determined that Greathouse failed to establish that her  diabetes was a severe impairment and further finds that the opinions of the consulting physicians in that regard are supported by the evidence in the record.

## C. The Claimant's Credibility

Greathouse also argues that the Commissioner failed to properly explain why it found her to be not credible. With respect to credibility, the Appeals Council stated the following: "The claimant does not have a medically determined condition that could reasonably be expected to

produce the symptoms alleged. Furthermore, the claimant's treatment history, during the period at issue, is not consistent with her description of the severity of her symptoms." (Doc. # 8-3, at 7).

Greathouse contends that the Appeals Council failed to address the second step of the two- step process for evaluating a claimant's assertions of pain and other limitations discussed by the Second Circuit in *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The Court notes that *Genier* considered the evaluation of a claimant's assertions in the context of "determining a claimant's RFC [residual functional capacity]," which would only take place if the Commissioner had already determined that the claimant had a severe impairment. *Id.* Here the Commissioner concluded that Greathouse had not demonstrated a severe impairment which obviated the need to determine her residual functional capacity.

 In any case, the second step of the process involves a consideration of "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (internal quotation marks omitted). Greathouse testified at the administrative hearing that she had retired because of her illness. When asked what her illness prevented her from doing, she answered, "Sitting. I was sick all day, nausea. I had - - I was sick all day. Couldn't stand to sit, or walk that far. . . . I couldn't - - diabet[es] make[s] my stomach sick, nauseous all the time, and I couldn't perform the duties, so that's why I retired." (Doc. # 8-3, at 39). There is no indication in any of the medical records that Greathouse's diabetes limited her ability to do basic work activities in any way or that she ever complained to a provider about diabetes-related nausea. The Court agrees with the Appeals Council that Greathouse's treatment history is not consistent with her description of the severity of her symptoms.

Greathouse submitted two activities of daily living forms in connection with her application for SSD, one in February 2010 and the second in August 2010. Both of these dates were well after the alleged disability onset date of June 2009. She indicated in both forms that she had no problem with personal care, and was able to drive a car and go out alone. At the March 12, 2012 hearing, however, she testified that she was unable to go to the store by herself. Additionally, when asked at the hearing, "Do you ever have any trouble taking care of yourself, in terms of hygiene?" she answered, "Yes, I do" and identified the problem as "taking a shower." (Doc. # 8-3, at 43). The inconsistencies between Greathouse's statements in 2010 on the activities of daily living forms and her testimony at the hearing in 2012[6] further calls into question the credibility of her testimony as to the nature and severity of her symptoms.

The Court finds that the Appeals Council sufficiently explained its reasoning regarding the claimant's credibility and that its determination  is supported by substantial evidence.


CONCLUSION

For the reasons stated above, the plaintiff's motion for judgment on the pleadings (**doc. # 14** ) is **DENIED** and the defendant's motion to affirm the Commissioner's decision (**doc. # 20**) is **GRANTED**.

---

[6]In her January 6, 2011, Disability Determination Explanation, Dr. Kuslis noted that Greathouse "did not allege worsening, new conditions or worsening of her condition" in connection with her request for reconsideration of the 2010 determination that she was not disabled. (Doc. # 8-4, at 13).

Judgment shall enter in favor of the defendant. The Clerk is directed to close the file.


SO ORDERED this 30th      day of January, 2015.



_____/s/ DJS_____
Dominic J. Squatrito
United States District Judge